**Leann M. WEED COVEY, Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**No. 13–CV–6602 EAW.**

United States District Court, W.D. New York.

Signed April 6, 2015.

Emily Karr–Cook, Law Office of Emily Karr–Cook, Elmira, NY, for Plaintiff.

Graham Morrison, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Leann M. Weed Covey ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiffs application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Jennifer Gale Smith was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted, and Plaintiffs motion (Dkt. 9) is denied. Plaintiffs complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On January 30, 2012, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 136–49). In her application, Plaintiff alleged a disability onset date of August 12, 2008. (Tr. 115, 136). Plaintiff initially alleged the following disabilities: learning disability, post-traumatic stress disorder ("PTSD"), chronic depression and anxiety, and a back injury. (Tr. 141). On July 24, 2012, the Commissioner denied Plaintiff's application. (Tr. 68–71). Plaintiff timely filed a request for a hearing before an ALJ. (Tr. 74).

On April 8, 2013, Plaintiff, represented by counsel, testified at a video hearing before ALJ Smith. (Tr. 30–55). On May 17, 2013, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 12–24).

On September 9, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). On November 7, 2013, Plaintiff filed this

civil action appealing the final decision of the Commissioner. (Dkt. 1).

## B. The Non–Medical Evidence

At the time of the hearing, Plaintiff was a 31–year–old female with a high school education. (Tr. 32). Plaintiff had attended special education classes. (Tr. 45). Plaintiff had previous work experience as a cashier, hostess, waitress, bus aide, and housekeeper. (Tr. 33, 36).

Plaintiff testified that she was divorced and lived in an apartment with one of her two children. (Tr. 32, 50). Plaintiff received public assistance from the state. (Tr. 33). She stopped working in 2009 because her "back [was] all messed up" following a car accident. (Tr. 35). Plaintiff testified that the x-rays showed she had a deteriorating disc, nodes, and arthritis in her back. (Tr. 36). Plaintiff said she had used a TENS unit, participated in physical therapy, taken medicine, and received injections to treat her back pain. (Tr. 38).

Plaintiff testified that she experienced mental difficulties following physical, emotional, and mental abuse from her ex-husband. (*Id.*). Plaintiff stated that she was diagnosed with major depression and anxiety as well as PTSD. (*Id.*). Plaintiff indicated that she took Klonopin, Zoloft, Effexor, and Ambien to cope with her mental difficulties. (Tr. 38–39). She stated that she had panic attacks and anxiety in crowds but was trying to get out more by going to the store with her mother or girlfriend. (Tr. 39). She testified that she had nightmares as a result of the abuse she suffered. (Tr. 46). Plaintiff claimed to hear voices, as recently as two days before the hearing. (Tr. 47). Plaintiff testified that she had attempted suicide and continued to have suicidal ideations. (Tr. 52–53).

Plaintiff stated that she could sit for five to ten minutes before needing to move.

(Tr. 41). Although Plaintiff had indicated on a form that she could lift up to 50 pounds, Plaintiff testified that she could no longer lift more than approximately a gallon of milk because her back had gotten worse. (Tr. 42). Plaintiff also testified that approximately three months before the hearing she had started to feel pain down her legs. (Tr. 43).

Plaintiff testified that she was able to shower and dress herself. (*Id.*). She cooked, cleaned, and performed household chores with the assistance of her son. (Tr. 44).

## C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

### 1. Physical Impairments

Plaintiff was involved in a car accident in 2009, and alleged that her various back, hip, and foot pain resulted from this accident. (Tr. 35).

On December 20, 2009, Plaintiff received a CT scan of her head, spine, chest, abdomen, and pelvis following a trauma. (Tr. 429). All scans were normal, although the CT of the thoracic spine revealed "Schmorl's nodes" with "no evidence to suggest an acute fracture." (*Id.*).

A February 19, 2010 MRI of Plaintiff's thoracic spine showed "no evidence of neoplastic or metastatic disease in the lumbar spine." (Tr. 416). The reviewing radiologist concluded that the MRI results were "unremarkable." (Tr. 417).

On July 7, 2010, Plaintiff had her first treatment with Nurse Practitioner ("NP") Shirley Glann at Arnot Medical Services. (Tr. 431). Plaintiff complained of thoracic pain, lumbar pain, hip pain, and left leg symptoms. (*Id.*). Plaintiff reported that her pain began following an automobile accident approximately six months earlier.

(*Id.*). NP Glann noted moderate tenderness in Plaintiff's spinal area as well as "moderate-to-severe spasms and several trigger points noted on palpation over the right and left lumbar paraspinals." (Tr. 433). NP Glann assessed lumbago, myalgia and myositis, and sacroilitis. (*Id.*). Plaintiff's prescription for Vicodin was continued, and Plaintiff was prescribed Celebrex. (*Id.*). NP Glann scheduled Plaintiff for a SI joint injection bilaterally. (Tr. 434).

Dr. Vidyasagar Mokureddy performed the steroid injection on July 20, 2010. (Tr. 427). At a follow up appointment on September 16, 2010, Plaintiff reported that she experienced a 50% pain reduction that lasted for only two days. (Tr. 424). Dr. Mokureddy noted moderate tenderness of the left SI joint, moderate tenderness of the right SI joint, and movement mildly restricted in all directions with pain reported on physical examination. (Tr. 425). Dr. Mokureddy discontinued Plaintiffs Vicodin prescription and prescribed Hydrocodone. (Tr. 426). Dr. Mokureddy assessed sacroilitis, lumbago, and myalgia. (*Id.*). At a follow up appointment on October 14, 2010, Plaintiff continued to report pain, and Dr. Mokureddy instructed Plaintiff to continue her pain medication regimen. (Tr. 422–23).

On December 3, 2010, NP Glann examined Plaintiff, who complained of "sharp, burning" pain in her thoracic spine, lumbar spine, hips, and left lower extremity. (Tr. 418). Plaintiff reported pain relief with her narcotic medications. (*Id.*). NP Glann noted moderate tenderness in the SI joints with movement mildly restricted in all directions. (Tr. 419).

On February 1, 2011, NP Glann treated Plaintiff for low back pain, and noted tenderness on palpation over the right and left sacroiliac joint as well as moderate to severe tenderness over the bilateral SI joint. (Tr. 408).

On April 1, 2011, Plaintiff treated with NP Glann, complaining of back and hip pain that had some relief with narcotic pain medication, but worsened with walking and bending over. (Tr. 404). Plaintiff had a largely normal physical examination, although NP Glann noted "moderate to severe tenderness over the left sacroiliac joint." (Tr. 405). NP Glann noted that Plaintiff used a TENS unit three times per day and reported 30–40% relief of pain. (*Id.*).

In a letter addressed to Dr. Wafaa Rizk dated April 19, 2011, David C.Y. Kung, M.D. reported that Plaintiff had no neurosurgical condition, and that Plaintiff's pain was "from unknown origin." (Tr. 415). Dr. Kung noted that Plaintiff had early disc degeneration that may indicate "Scheuermann's disease," but even if Plaintiff had that condition, there was no spinal cord compression to warrant surgical treatment. (*Id.*).

On May 3, 2011, Plaintiff complained of back pain rated at 10 out of 10 for the past 30 days. (Tr. 400). Plaintiff indicated that the pain medication was controlling her pain, and that the pain did not interfere with eating, bathing, using the toilet, dressing, or getting up from her bed or a chair. (*Id.*). Plaintiff had a limited range of motion. (Tr. 402). NP Hoffman scheduled Plaintiff for a left sacroiliac joint injection. (*Id.*).

On June 1, 2011, Plaintiff treated with NP Hoffman for back pain. (Tr. 397). Plaintiff had a limited range of motion and pain with back flexion, extension, and lateral flexion. (Tr. 398). NP Hoffman assessed low back pain, myalgia and myositis, and sacroilitis. (Tr. 399). Plaintiff reported that the medications were working well. (*Id.*). NP Hoffman advised Plaintiff to follow up with Dr. Rizk regarding her left arm numbness and possible carpal tunnel syndrome. (*Id.*).

On August 29, 2011, Plaintiff informed NP Hoffman that she had numbness and problems staying asleep, and that she experienced depression and anxiety. (Tr. 393). On physical examination, Plaintiff had a limited range of motion with flexion, extension, and lateral bending on both sides. (Tr. 395). NP Hoffman assessed low back pain, myalgia and myositis, and sacroilitis. (*Id.*). Plaintiff was prescribed hydrocodone for pain, Mobic for pain, and skelaxin for muscle spasms. (*Id.*).

Plaintiff treated with NP Hoffman on October 26, 2011, for low back pain. (Tr. 391). Plaintiff was prescribed Mobic for pain, Robaxin for low back pain, and Oxycodone for pain. (*Id.*). NP Hoffman noted that Plaintiff's medications may impact her ability to return to work, drive, operate machinery, and perform other safety-sensitive work. (*Id.*).

On November 4, 2011, Plaintiff treated with Dr. Rizk, presenting with anxiety and depression. (Tr. 199). Plaintiff was working as a waitress and sought a note to be excused from work as a result of her depression. (*Id.*). Dr. Rizk assessed panic attacks, anxiety, depression, and "GERD," and noted that Plaintiff was on a waiting list for "FSCC." (Tr. 201).

On November 11, 2011, NP Karen Gallaher noted that Plaintiff complained of pain localized to her right foot, and that Plaintiff had recently suffered a fall. (Tr. 196). On physical exam, Plaintiff was unable to bear weight on her right foot and was using crutches. (Tr. 198). NP Gallaher referred Plaintiff to an orthopedist. (*Id.*).

Matthew R. Brand, M.D. of Finger Lakes Orthopedic Surgery examined Plaintiff on November 16, 2011, for a right foot injury after Plaintiff "slipped down stairs." (Tr. 412). An x-ray showed no acute fracture or abnormality, but Plaintiff requested a cast, and Dr. Brand applied a "well-padded short leg cast." (Tr. 413).

On December 19, 2011, Plaintiff treated with NP Robyn Hoffman, complaining of mid and lower back pain radiating to her left foot at an intensity of 7 out of 10. (Tr. 193). Plaintiff had recently fallen down a flight of 13 stairs and had torn ligaments in her right foot. (*Id.*). She had been treated at the emergency department and was given an ace wrap, boot, and crutches. (*Id.*). Plaintiff requested a change in medication because oxycodone was making her sleepy. (*Id.*). Plaintiff's physical examination was largely normal; although NP Hoffman noted that Plaintiff had limited active range of motion with flexion of Plaintiff's spine. (Tr. 194). NP Hoffman assessed severe low back pain, unspecified myalgia and myositis, and sacroilitis. (Tr. 195). Plaintiff's medications were adjusted. (*Id.*).

On January 18, 2012, Dr. Rizk examined Plaintiff in a routine follow up. (Tr. 190). Plaintiff reported pain in her upper back, mid back, lower back, left thigh, left calf, left shin, and left ankle. (*Id.*). Plaintiff had recently fallen down the stairs and was directed to follow up with orthopedics for a possible torn ligament. (Tr. 192). Dr. Rizk further assessed stable bipolar disorder with depression and panic attacks. (*Id.*). Plaintiff's dosage of lamictal was increased to address panic attacks and depression. (*Id.*).

Plaintiff sought treatment on February 23, 2012, with Sam Thompson, M.D. of Priority Community Health Care, for complaints of chest tightness, coughing, and wheezing. (Tr. 232). Dr. Thompson noted that Plaintiff was moderately obese and had "diffuse expiratory wheezes." (Tr. 233). Dr. Thompson assessed anxiety, bipolar disorder, depressive disorder, shortness of breath, and acute upper respiratory infection. (*Id.*).

On February 28, 2012, Dr. Thompson examined Plaintiff, who was complaining of

wheezing and shortness of breath. (Tr. 229). Plaintiff's physical examination was largely normal, except for "expiratory wheezes" noted. (Tr. 230). Dr. Thompson assessed wheezing and anxiety, directed Plaintiff to engage in smoking cessation, and prescribed an inhaler. (Tr. 231).

Treatment notes from NP Hoffman dated March 16, 2012, indicate that Plaintiff was reporting pain in her mid-back and lower back rated at an intensity of 9 out of 10 consistently. (Tr. 187). Plaintiff indicated that medication lowered her pain to 2 out of 10 in intensity, and that relief lasted for approximately four hours. (Id.). Plaintiff reported that her pain worsened with activity, walking, and bending over. (Id.). NP Hoffman assessed that Plaintiff's pain did not interfere with eating, bathing, using the toilet, getting dressed, or getting up from her bed or a chair. (Id.). Plaintiff's pain was well controlled with her current medication regimen. (Id.). Plaintiff's physical examination was normal, except Plaintiff reported pain with back flexion. (Tr. 189).

On March 27, 2012, Plaintiff was treated by Dr. Brand for right foot pain after "stepping wrong" going down stairs. (Tr. 184). Dr. Brand noted that x-rays showed no bone abnormality and that Plaintiff's pain could last for approximately three months. (Tr. 186). Plaintiff was given a boot to wear. (Id.).

On March 28, 2012, Dr. Thompson noted a normal physical examination, but recommended Plaintiff "go for a psych evaluation at the ER as she is having [almost] constant severe anxiety and freq[uent] panic attacks." (Tr. 228).

On April 19, 2012, Plaintiff visited NP Rebecca Fears, who noted a normal physical examination, but referred Plaintiff to the nutrition clinic per Plaintiff's request. (Tr. 225).

On May 25, 2012, Plaintiff treated with NP Fears, who noted that Plaintiffs physi-cal examination was normal, although Plaintiff complained of back pain that was under treatment with the pain management clinic. (Tr. 221–22).

A scan of Plaintiff's lumbosacral spine dated June 5, 2012, was normal. (Tr. 236). Views of the thoracic spine showed a minimal levoscoliosis which "may be positional." (Tr. 235). No other abnormalities appeared. (Id.).

On June 14, 2012, Plaintiff treated with NP Hoffman with complaints of pain in the mid and lower back radiating to her left foot. (Tr. 379). NP Hoffman noted "moderate-to-severe spasms and several trigger points noted on palpation over the right and left lumbar paraspinals" as well as "over the right and left thoracic paraspinals." (Tr. 381). NP Hoffman assessed low back pain, myalgia and myositis, sacroilitis, and tobacco use. (Id.). NP Hoffman set a plan to call Plaintiff in two weeks for a pill count to ensure compliance with her medications. (Id.).

On July 12, 2012, NP Hoffman treated Plaintiff for pain localized to the mid back and lower back that Plaintiff claimed radiated to her left foot. (Tr. 375). NP Hoffman noted that Plaintiff had a recent fall. (Id.). Plaintiff appeared well developed, well nourished, in no apparent distress, with ongoing low back pain. (Tr. 376). NP Hoffman assessed low back pain, myalgia and myositis, sacroilitis, and tobacco use. (Id.). NP Hoffman refilled Plaintiff's prescription of hydrocodone and acetaminophen, but noted that she intended to wean Plaintiff off of the pain medication. (Tr. 377). Plaintiff was advised to stop smoking and Plaintiff chose not to participate in tobacco cessation intervention. (Id.).

Dr. Brand examined Plaintiff on November 12, 2012, to follow up on Plaintiff's right foot injury. (Tr. 410). Plaintiff was directed to continue using her boot, and

Dr. Brand noted that Plaintiff could engage in activities "as tolerated." (Tr. 411).

On March 6, 2013, Dr. Ashraf Sabahat of the Schuyler Hospital Pain Management Center noted a history of upper and lower back pain stemming from a 2009 motor vehicle accident, and prescribed Plaintiff with diclofenac for this pain. (Tr. 359).

### 2. Mental Impairments

On October 6, 2011, Vanessa Miller, LMSW of Family Services of Chemung County ("FSCC"), noted that Plaintiff appeared in a neutral mood with an anxious affect. (Tr. 269). Plaintiff reported that she did not feel like herself and had increased rage behaviors, such as punching walls and knocking things off desks. (*Id.*). Plaintiff cancelled or did not appear for appointments scheduled October 14, 2011, October 19, 2011, November 7, 2011, November 14, 2011, November 29, 2011, December 13, 2011, December 20, 2011, or January 26, 2012. (Tr. 270–77). Ms. Miller discharged Plaintiff from the system on January 20, 2012, as a result of Plaintiff's failure to return to her appointments. (Tr. 278). Ms. Miller noted diagnoses of depressive disorder, posttraumatic stress disorder, and bipolar disorder. (*Id.*). She further noted that Plaintiff had severe back pain, thyroid problems, and her father was "just diagnosed with cancer." (*Id.*).

Plaintiff returned to FSCC on March 7, 2012, on a referral from Dr. Thompson. (Tr. 280). Deborah Berman, LCSWR, stated that Plaintiff was well oriented and appeared alert, but had a depressed mood. (Tr. 282). Plaintiff's recent and remote memory was "mildly impaired." (*Id.*). Ms. Berman noted diagnoses of depressive disorder and post-traumatic stress disorder, as well as severe back pain and thyroid problems. (*Id.*). Plaintiff reported that she "would like to disappear," but reported no plans to hurt herself. (Tr. 285).

On March 21, 2012, Plaintiff visited Amanda Pelcher, LMFT, of FSCC. (Tr. 287). Ms. Pelcher stated that Plaintiff presented as depressed with noted financial strain and harassment from her ex-husband. (*Id.*). Ms. Pelcher noted diagnoses of depressive disorder and post-traumatic stress disorder with a history of severe back pain and thyroid problems. (Tr. 288). Plaintiff cancelled her appointment scheduled for March 28, 2012. (Tr. 291).

On March 28, 2012, Plaintiff admitted herself to St. Joseph's Hospital for depression, intrusive thoughts of suicide, anhedonia, decreased appetite, insomnia, and restlessness. (Tr. 203). Dr. Behrooz Ebrahimi–Fard determined that Plaintiff did not have bipolar disorder and discontinued Plaintiff's lithium prescription. (*Id.*). Plaintiff was prescribed Xanax and Zoloft. (*Id.*). Plaintiff was diagnosed with major depression, hypothyroidism, "GERD," and asthma. (*Id.*). Plaintiff was discharged on April 2, 2012, and was "psychiatrically stable, [was] not a danger to self or others and [did] not meet the criteria for further psychiatric hospitalization." (*Id.*).

On April 5, 2012, Plaintiff informed Ms. Pelcher that she had her mother and girlfriend take her to "the BSU" because she was "feeling overwhelmed, depressed, irritable, and crying a lot." (Tr. 292). Plaintiff reported that her stay at BSU helped, and that she was prescribed Xanax and Zoloft. (*Id.*). Plaintiff cancelled her April 12, 2012 appointment. (Tr. 295).

On April 16, 2012, Ms. Pelcher noted that Plaintiff presented as mildly depressed, but reported that she had been "doing a little better, citing a walk she took with her girlfriend, the possibility of moving to the country, and volleyball at Easter as helpful in alleviating her depressed mood slightly." (Tr. 296). Plain-

tiff cancelled her April 23, 2012 appointment. (Tr. 301).

Psychiatrist Muhammad Alam of FSCC conducted an initial psychiatric examination of Plaintiff on April 24, 2012. (Tr. 300). Dr. Alam stated that Plaintiff appeared calm and cooperative with a stable affect, although she had a depressed mood. (Tr. 298). Plaintiff denied any visual hallucinations, but claimed that she sometimes heard her brother's voice calling to her. (Id.). Dr. Alam diagnosed PTSD, major depressive disorder, and panic disorder with agoraphobia. (Tr. 298–99). Dr. Alam increased Plaintiff's dosage of Zoloft, instructed her to wean off of Xanax, started Plaintiff on Klonopin with a plan to taper the Klonopin as Zoloft kicked in. (Tr. 299). Plaintiff was also taking Vicodin for pain management. (Id.). Plaintiff cancelled her follow up appointment on May 2, 2012, and did not show up for her appointment on May 8, 2012. (Tr. 303–04).

On April 27, 2012, Ms. Pelcher stated that Plaintiff appeared quiet and depressed, and reported hearing her deceased brother's voice. (Tr. 302).

On May 11, 2012, Dr. Alam noted that Plaintiff appeared calm and cooperative with a depressed mood. (Tr. 305). Plaintiff denied any auditory or visual hallucinations. (Id.). Dr. Alam prescribed Seroquel to assist with Plaintiff's insomnia and to treat any auditory hallucinations. (Id.).

At a follow up appointment on May 15, 2012, Ms. Pelcher stated that Plaintiff reported panic attacks three to four times per day. (Tr. 308). Plaintiff presented as depressed and stressed, and reported hearing voices instructing her to do things. (Id.). Plaintiff cancelled her May 29, 2012 appointment due to transportation issues. (Tr. 310). Plaintiff did not show for her June 4, 2012 or June 8, 2012 appointments. (Tr. 311–13).

On June 15, 2012, Dr. Alam prescribed Effexor for depression and anxiety. (Tr. 314).

On June 21, 2012, Ms. Pelcher modified Plaintiff's diagnoses to include "major depressive disorder, recurrent, severe with psychotic features" because Plaintiff reported auditory hallucinations. (Tr. 316). Plaintiff did not show for her June 25, 2012 appointment. (Tr. 319).

On June 29, 2012, Ms. Pelcher stated that Plaintiff presented as "euthymic," having been awarded full custody of her son. (Tr. 320). Plaintiff reported receiving harassing texts from her former best friend, her ex-husband's new wife. (Id.).

Plaintiff told Dr. Alam on July 13, 2012, that she was still feeling a little depressed and anxious but was having "more better days than bad days." (Tr. 321).

Plaintiff rescheduled her July 16, 2012 appointment with Ms. Pelcher due to transportation issues, but did not show for her July 23, 2012 appointment. (Tr. 322–23). Plaintiff also failed to appear on August 1, 2012. (Tr. 324). Ms. Pelcher consulted with Dr. Alam on August 3, 2012, noting that she had not seen Plaintiff since the end of June and requested that she be permitted to attend Plaintiff's next session with Dr. Alam. (Tr. 325). Plaintiff did not show for her scheduled appointments on August 10, 2012 or August 14, 2012 with Dr. Alam. (Tr. 326).

On July 23, 2010, State agency medical consultant L. Meade reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique. (Tr. 237–54). Dr. Meade opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, but no repeated episodes of deterioration of extended duration. (Tr. 247). After reviewing the record, Dr. Meade

opined that Plaintiff's alleged psychiatric impairments were credible, but not to the degree alleged. (Tr. 253). Dr. Meade found that Plaintiff was capable of performing unskilled work. (*Id.*).

Plaintiff appeared for an appointment with Dr. Alam on August 17, 2012, reporting that she was "doing bad at this time." (Tr. 328). Plaintiff stated that she ran out of medication and started feeling depressed and anxious. (*Id.*). Dr. Alam noted that Plaintiff appeared depressed and had a constricted affect. (*Id.*). Plaintiff cancelled her follow up appointment on August 24, 2012. (Tr. 330). On August 24, 2012, Ms. Pelcher noted that Plaintiff was informed she must appear for her therapist appointment and psychiatrist appointment on August 28, 2012, or her case would be closed and she would be required to seek services elsewhere. (Tr. 331).

On August 28, 2012, Plaintiff told Dr. Alam that she was feeling depressed and anxious as a result of issues with her ex-husband reporting her partner to child protective services and her grandmother passing away. (Tr. 332). Dr. Alam noted that Plaintiff was depressed with an anxious affect. (*Id.*). Senior Therapist Cindy Allington saw Plaintiff on August 28, 2012, and confirmed the attendance policy with Plaintiff, who reported transportation difficulties. (Tr. 334). Plaintiff cancelled her September 17, 2012 appointment, citing transportation difficulties. (Tr. 335).

On September 21, 2012, Plaintiff informed Ms. Pelcher that her ex-husband resumed physical placement of her son because Plaintiff did not have a car to drive her son to school. (Tr. 336). Ms. Pelcher noted diagnoses of PTSD, major depressive disorder, and panic disorder with agoraphobia. (Tr. 337).

On September 25, 2012, Dr. Alam increased Plaintiff's Effexor dosage. (Tr. 340).

Plaintiff cancelled her October 4, 2012, October 29, 2012, November 5, 2012, November 19, 2012, and December 5, 2012 appointments with Ms. Pelcher due to transportation issues. (Tr. 341–46).

On December 13, 2012, Plaintiff told Ms. Miller she was experiencing anxiety and worry over the custody battle for her youngest son. (Tr. 349).

On January 8, 2013, Ms. Miller noted that Plaintiff reported stress as a result of not seeing her son for approximately one month. (Tr. 347). Plaintiff cancelled her January 3, 2013 appointment. (Tr. 348).

Plaintiff informed Ms. Miller on February 6, 2013, that she had "signed her [rights] off to her ex for her son." (Tr. 362). Plaintiff experienced crying episodes and increased depression. (*Id.*). Plaintiff cancelled her appointment on February 27, 2013, due to poor weather conditions. (Tr. 363). Plaintiff cancelled her appointment on March 6,2013. (Tr. 364).

On February 28, 2013, Ms. Miller and Dr. Alam diagnosed Plaintiff with PTSD, major depressive disorder and panic disorder with agoraphobia. (Tr. 368). John Thomassen performed intellectual testing on Plaintiff on February 28, 2013, and established that Plaintiff functioned at a borderline intellectual level. (Tr. 64). On the Wechsler Adult Intelligence Scale Third Edition (WAIS–III), Plaintiff attained a Full Scale IQ of 78, a Verbal IQ of 81, and a Performance IQ of 79. (*Id.*).

On March 13, 2013, Ms. Miller noted that Plaintiff appeared "somewhat depressed." (Tr. 365). Plaintiff cancelled her March 27, 2013 and April 1, 2013 appointments. (Tr. 366–67).

### D. Determining Disability Under the Social Security Act

█ The Social Security Act provides that a claimant will be deemed to be dis-

abled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations.

If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## III. DISCUSSION

### A. Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

■ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiffs position. *See Perez v. Chater,* 77 F.3d 41, 46–47 (2d Cir.1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

## B. Analysis of ALJ's Determination

### 1. Step One

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 30, 2012, the date of her application. (Tr. 17). The parties do not contest this determination and it is supported by substantial evidence.

### 2. Step Two

■ At the second step, the ALJ found that Plaintiff had the following severe impairments: PTSD, anxiety with agoraphobia, depression; bipolar disorder, borderline intellectual functioning ("BIF"), and asthma. (*Id.*). The ALJ also noted that Plaintiff complained of back pain, hip pain, early degenerative changes in her spine with nodes, and a right foot contusion, but determined that the medical record did not support that these were severe impairments. (*Id.*).

Plaintiff contends that it was "clear legal error" for the ALJ to fail to consider Plaintiff's complaints of back pain as a severe impairment. (Dkt. 9 at 34–36). Plaintiff notes that she treated with a pain specialist "on a consistent basis for two years" and was prescribed medication for her back pain. (*Id.* at 35). The Commissioner argues that the ALJ properly considered Plaintiff's allegations of pain as a symptom. (Dkt. 12 at 17).

In rejecting Plaintiff's allegations of back pain as a severe impairment, the ALJ noted that the medical record showed Plaintiffs pain was well controlled with medication, and that Plaintiff had no side effects from the medication. (Tr. 18). The ALJ further noted that no medical imaging of Plaintiff's spine showed evidence of disease or significant degenerative changes. (*Id.*). Neurosurgeon Dr. Kung examined Plaintiff and found that he could not find a source to explain her pain. (*Id.*). As a result, the ALJ's finding that Plaintiffs back pain was not a severe impairment was supported by substantial evidence in the record. *See Mineo v. Colvin,* No. 12–CV–410, 2014 WL 4773955, at *8 (W.D.N.Y. Sept. 24, 2014) ("Pain or other symptoms may be important factors contributing to a disability claimant's functional loss and may affect a claimant's ability to perform basic work activities if relevant

medical signs or laboratory findings show the existence of a medically determinable impairment that could reasonably be expected to cause the associated pain or other symptoms.") (citing 20 C.F.R. § 404.1529(c)(3)).

■ Even if the ALJ erred in determining that Plaintiff's alleged back pain was not a severe impairment, such an error would be harmless. The ALJ found that Plaintiff had several severe impairments and proceeded to step three of the sequential analysis, and also considered Plaintiff's allegations of back pain in formulating her RFC. (Tr. 18, 2122). "Because Step Two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin,* 48 F.Supp.3d 578, 593 (S.D.N.Y.2014); *see also Cook v. Astrue,* No. 08–CV–1351 TJM/VEB, 2011 WL 2490996, at *4 (N.D.N.Y. May 24, 2011) *report & recommendation adopted,* No. 08–CV–1351, 2011 WL 2471300 (N.D.N.Y. June 22, 2011) ("Moreover, because the ALJ concluded that Plaintiff had other impairments considered severe under the Act (*i.e.,* major depression, social/generalized anxiety, and obsessive compulsive disorder) and continued with the sequential analysis, any arguable error in his finding with respect to the severity of Plaintiff's PTSD was harmless."); *Fortier v. Astrue,* No. 3:10cv01688(MRK)(WIG), 2012 WL 3727178, at *9 (D.Conn. May 11, 2012) ("[B]ecause the ALJ found at least one impairment to be severe and continued to step three in the sequential evaluation process, her failure to recognize all of Plaintiff's severe impairments was harmless error.").

### 3. Step Three

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled. (Tr. 19–21). Specifically, the ALJ considered Listings 1.04, 12.04, and 12.06. (Tr. 19). Plaintiff does not contest the ALJ's findings at step three, and it appears that the ALJ's findings were supported by substantial evidence.

### 4. Step Four

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Tr. 21). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform a full range of work at all exertional levels but with the following non-exertional limitations: she retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend a routine and maintain a schedule; can relate to and interact with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals; and can handle reasonable levels of simple work related stress in that she can make simple decisions directly related to the completion of her tasks in a stable work environment. The claimant should avoid concentrated exposure to respiratory irritants such as dust, odors, fumes and gases.

(*Id.*).

#### a. Substantial Evidence

#### i. Duty to Develop the Record

Plaintiff argues that the ALJ erred in relying on the opinion of State agency psychiatrist Dr. Meade that Plaintiff was not disabled and Dr. Kung's statement that there was no identifiable source for

Plaintiff's alleged pain, instead of seeking additional information from Plaintiff's treating sources or hiring a consultative examiner to develop the record with respect to Plaintiff's limitations as a result of her mental and physical impairments. (Dkt. 9 at 21–27). The Commissioner argues that the burden was on Plaintiff to demonstrate how her alleged impairments impacted her functioning, and that the lack of a functional assessment does not mandate remand because the record was sufficient to support the ALJ's RFC assessment. (Dkt. 12 at 10–11).

■■■■■ "It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case, and that remand is appropriate where this duty is not discharged." *Brown v. Comm'r of Soc. Sec.*, 709 F.Supp.2d 248, 255 (S.D.N.Y.2010) (citations omitted). "The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel." *Cruz v. Astrue*, 941 F.Supp.2d 483, 495 (S.D.N.Y.2013). Encompassed in this duty is the requirement that an ALJ assemble the claimant's complete medical history and re-contact treating physicians or obtain consultative examinations where the information received is inadequate to determine whether the claimant is disabled. *See Wells v. Colvin*, No. 14–CV–197–JTC, 2015 WL 1280536, at *7 (W.D.N.Y. Mar. 20, 2015) (citing 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii)).

■■■■■ Despite this duty, courts in this Circuit have found that "it is not per se error for an ALJ to make the RFC determination absent a medical source assessment as to what the claimant can still do despite the limitations caused by his or her impairments." *Housser v. Colvin*, No. 13–CV–1133–JTC, 2015 WL 162985, at *5 (W.D.N.Y. Jan. 7, 2015) (quotations omitted). "[R]emand is not always required when an ALJ fails in his duty to request

opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 29, 33 (2d Cir.2013). "Although an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue*, 474 Fed.Appx. 801, 804 (2d Cir.2012) (quotations and citations omitted). The question is whether the administrative record, even lacking the opinion of a treating physician, is "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability." *Sanchez v. Colvin*, No. 13 Civ. 6303(PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015). *Cf. Rosa v. Callahan*, 168 F.3d 72, 79–80 (2d Cir.1999) (finding the ALJ committed legal error where the ALJ failed to develop the facts of the case where there were "scant" medical notes and the ALJ did not seek records from numerous physicians referenced in the claimant's testimony).

■■■ "Under the particular circumstances of this case, the Court finds that the ALJ was not remiss with regard to her duty to request opinions from Plaintiff's treating sources." *Hogan v. Colvin*, No. 1:12–cv–1093(MAT), 2015 WL 667906, at *6 (W.D.N.Y. Feb. 17, 2015). The report of consultative examiner Dr. Meade and the opinion of Dr. Kung were not "inconsistent with the relatively benign clinical findings and assessments by Plaintiff's treating physicians." *Id.*

As for Plaintiff's alleged physical impairments, the ALJ properly noted that the ample medical records demonstrated no

objective findings to identify a source for Plaintiff's alleged pain. (Tr. 19, 21–22). Plaintiff was in a car accident in December 2009, but CT scans and MRIs following that accident were unremarkable. (Tr. 416–17, 429). Scans of Plaintiff's spine in 2012 were also normal. (Tr. 235–36). Plaintiff later complained of radiating pain to her foot, but x-rays showed no abnormalities. (Tr. 184, 193). Notably, Plaintiff complained of foot pain at times that she had also suffered falls. (Tr. 184, 196, 410, 412–13). Plaintiff treated at a pain clinic, but providers at the clinic frequently noted that Plaintiff's pain was controlled with her medication regimen. (Tr. 187, 377, 381, 399, 418). When Plaintiff's treating physician, Dr. Rizk, examined Plaintiff, he assessed mental limitations, but no physical limitations. (Tr. 192). "[T]he Court finds it doubtful that a medical source statement from any of these providers would have altered the ALJ's assessment of Plaintiff's RFC." *Hogan*, 2015 WL 667906, at *6.

"The ALJ 'did not substitute her medical judgment for any physician's evaluation, but … relied upon the substantial medical records and the testimony to reach a reasoned determination of the plaintiff's work capacity.'" *O'Neil v. Colvin*, No. 13–CV–575–JTC, 2014 WL 5500662, at *7 (W.D.N.Y. Oct. 30, 2014) (quoting *Rodriguez v. Apfel*, No. 96 Civ. 8330(JGK), 1998 WL 150981, at *11 n. 13 (S.D.N.Y. Mar. 31, 1998)); *see also Gardner v. Colvin*, No. 13–CV–787–JTC, 2014 WL 5149702, at *6 (W.D.N.Y. Oct. 14, 2014) (where ALJ's written decision revealed that he considered all of the medical evidence of record, the court concluded that the ALJ's RFC assessment was based on a sufficiently developed record, and the ALJ did not commit legal error by failing to obtain an assessment from a treating source); *Pellam v. Astrue*, 508 Fed.Appx. 87, 90 (2d Cir.2013) ("[E]specially considering that the ALJ also had all of the treatment notes from [Plaintiff's] treating physicians … the ALJ [did not have] any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians.").

The record does not support Plaintiff's argument that a consultative examination or opinion of a treating physician was necessary for the ALJ to reach an informed decision as to Plaintiff's alleged mental impairments. Although Dr. Meade assessed moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace, she concluded, nonetheless, that Plaintiff retained the ability to understand and follow simple instructions and directions, and perform simple tasks independently. (Tr. 247, 251–53). This finding was consistent with the administrative record. Plaintiff completed her high school education and was able to manage her personal and daily living needs independently. (Tr. 32, 43–44). To the extent Plaintiff had cognitive limitations, these limitations were accommodated in the ALJ's RFC, which limited Plaintiff to simple tasks. (Tr. 21). *See O'Neil*, 2014 WL 5500662, at *7 (rejecting plaintiff's arguments on these grounds). The RFC also restricted Plaintiff's interactions with others, noting that Plaintiff could "relate to and interact with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals." (Tr. 21).

#### ii. Stress

Plaintiff argues that stress is "highly individualized," and that the ALJ "misinterpreted the facts when she found that [Plaintiff] would be able to withstand the added stress of employment...." (Dkt. 9 at 33). The ALJ noted that Plaintiff had successfully ended her marriage and participated in an "acrimonious" custody battle, without any evidence of decom-

pensation. (Tr. 20). Plaintiff argues that the record demonstrates that she experienced stress, anxiety, nightmares, flashbacks, and auditory hallucinations during this time. (Dkt. 9 at 33–34).

The ALJ's RFC states that Plaintiff could "handle reasonable levels of simple work related stress in that she can make simple decisions directly related to the completion of her tasks in a stable work environment." (Tr. 21). The record shows that Plaintiff was able to complete household chores, shop, and care for her children. (Tr. 44, 151–54, 160, 253, 279, 355). Treatment notes from Dr. Alam indicated that Plaintiffs symptoms were largely controlled with medications, and Plaintiff denied further auditory hallucinations or suicidal ideations. (Tr. 314, 321, 328, 332, 340). Plaintiff identified coping skills such as reading, walking, listening to music, playing games with her son, spending time with family, and screaming into a pillow. (Tr. 296, 360). Accordingly, the ALJ's finding that Plaintiff could handle work stress related to simple tasks was supported by substantial evidence in the record.

### iii. Borderline IQ

Plaintiff argues that the ALJ did not consider her borderline IQ in formulating the RFC. (Dkt. 9 at 24). Contrary to Plaintiff's argument, the ALJ explicitly referenced Plaintiffs borderline intellectual functioning as a severe impairment and discussed Plaintiffs IQ scores in the text of her decision. (Tr. 17–18, 21–22). In discussing the basis for her RFC finding, the ALJ noted that Plaintiff completed a high school education and had worked as a waitress and cashier with no indication that she left that employment due to intellectual or emotional impairments. (Tr. 21–22). The RFC limits Plaintiff to simple tasks and instructions. (Tr. 21). Accordingly, the ALJ considered Plaintiff's intellectual functioning in formulating her RFC and

her RFC was supported by substantial evidence with respect to Plaintiff's borderline intellectual functioning.

### b. Credibility Determination

Plaintiff argues that the ALJ's credibility analysis was unsupported by substantial evidence, and that the ALJ improperly construed various sections of the administrative record in finding Plaintiff's allegations of pain and limiting symptoms to be less than fully credible. (Dkt. 9 at 27–32).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

In the instant case, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms. (Tr. 21). Second, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these

symptoms are not credible to the extent they are unsupported by competent medical evidence and opinion[s] and [are] contradicted by other evidence." (Tr. 22).

In evaluating a Plaintiffs credibility, the ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart*, 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c).

Plaintiff argues that the ALJ improperly construed Plaintiff's activities of daily living. (Dkt. 9 at 30–32). The ALJ found that although Plaintiff testified that she had difficulty leaving home, the record demonstrated that she played volleyball, camped, and fished. (Tr. 22). Plaintiff contends that this was an improper interpretation of her daily activities, as they were only referenced briefly in her treatment notes. (Dkt. 9 at 30). However, Plaintiff self-reported that her hobbies and interests included reading, camping, and swimming. (Tr. 154). Further, Plaintiff

reported that she was able to complete household chores, shop, and care for her children. (Tr. 44, 152–54, 160, 253, 279, 355). "[I]t is well-settled that '[s]uch activities do not by themselves contradict allegations of disability,' as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Knighton v. Astrue*, 861 F.Supp.2d 59, 69 (N.D.N.Y.2012) (quoting *Woodford v. Apfel*, 93 F.Supp.2d 521, 529 (S.D.N.Y.2000)). But Plaintiff's activities of daily living are only one of many factors the ALJ considered in finding that Plaintiff's allegations of pain and limitations were not as significant as she alleged.

The ALJ stated that she found Plaintiff's testimony to be less credible because Plaintiffs allegations of limitations were inconsistent with Plaintiffs reported activities. (Tr. 22). For example, Plaintiff complained of asthma, but continued to smoke. (*Id.*). Plaintiff testified that she could not lift a gallon of milk, but self-reported on an earlier date that she could lift up to 50 pounds. (*Id.*). Plaintiff testified that she was admitted to the hospital for attempting suicide by slitting her wrists with a razor, yet the medical records from her admittance to the hospital show that she was admitted with suicidal ideations, not for an attempt. (*Id.*). The hospital records further note that Plaintiff demonstrated remarkable improvement during her first few days in the hospital. (*Id.*). "The [ALJ] may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period." *Morris v. Comm'r of Soc. Sec.*, No. 5:12–cv–1795(MAD/CFH), 2014 WL 1451996, at *6 (N.D.N.Y. Apr. 14, 2014).

Treatment notes in the record state that Plaintiff was responding well to treatment and was able to "do more things outside of

the house since the beginning of treatment and [experienced an] absence of suicidal ideation for more than six months" by Plaintiff's own report. (Tr. 279).

In sum, there was substantial evidence in the record to support the ALJ's conclusions with respect to Plaintiff's ability to engage in activities of daily living. Further, "[i]t is the function of the Commissioner, and not the reviewing court, to pass on the credibility of witnesses, including the claimant's description of symptoms and pain, and to resolve material conflicts in the testimony." *Echevarria v. Apfel,* 46 F.Supp.2d 282, 293 (S.D.N.Y.1999).

Plaintiff also contends the ALJ erred by finding that Plaintiff's noncompliance with treatment negatively impacted Plaintiff's credibility because, Plaintiff argues, her mental illness was the cause for her noncompliance. (Dkt. 9 at 27–30).

The ALJ stated that it was "clear that the claimant improve[d] with treatment, yet she [had] repeatedly failed to follow through with the same. She missed so many mental health appointments that her providers considered closing her case." (Tr. 22). Although some of these appointments were missed as a result of transportation issues, that did not "explain the overwhelming majority" of missed appointments. (*Id.*).

A claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as proscribed." SSR 96–7p, 1996 WL 372186, at *7 (July 2, 1996). Yet, "an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *McDowell v.*

*Colvin,* No. 11–CV–1132(NAM/VEB), 2013 WL 1337152, at *13 (N.D.N.Y. Mar. 11, 2013) (quotation omitted).

Here, the ALJ was permitted to consider Plaintiff's noncompliance with treatment as a factor weighing against Plaintiff's credibility. *See Jackson v. Barnhart,* No. 06–CV0213, 2008 WL 1848624, at *11 (W.D.N.Y. Apr. 23, 2008) (finding plaintiffs missed appointments with her counselors and failure to adhere to medication regimen weighed against plaintiffs credibility). The fact that the ALJ did not explicitly reference Plaintiff's alleged mental impairments as a cause for noncompliance does not mean that it was not considered. *See Greene v. Colvin,* 936 F.Supp.2d 216, 226 (W.D.N.Y.2013) (ALJ's failure to cite specific evidence does not indicate that it was not considered). Moreover, the treatment notes of Plaintiffs mental health providers do not suggest that Plaintiff missed appointments as a result of Plaintiff's mental health; rather, they often referenced transportation issues, or that Plaintiff was "injured," or that Plaintiff cancelled without an explanation. The ALJ's finding that Plaintiff's credibility was diminished by her failure to regularly attend treatment sessions was supported by ample cancellation and no-show notes in Plaintiff's medical record. (Tr. 270–77, 291, 301, 303–04, 311–13, 319, 326, 330–31, 334–35, 341–46, 348, 364, 366–67).

Plaintiff further argues that the ALJ was required to consider her "sparse work record" as evidence that Plaintiff was unable to work. (Dkt. 9 at 30–31). Instead, the ALJ found that Plaintiff's "modest work history [did] not evidence a strong attachment to the work force." (Tr. 22). The ALJ recognized that Plaintiff did not leave her previous work as a result of her impairments, but left because of an automobile accident. (*Id.*). Plaintiff believes the ALJ should have considered her ab-

sence from work as an impaired ability to work. (Dkt. 9 at 31).

"Although work history may be deemed probative of credibility, it is only one of many factors to be considered." *Hargrave v. Colvin*, No. 13–CV–6308(MAT), 2014 WL 3572427, at *6 (W.D.N.Y. July 21, 2014). "Just as a good work history may be deemed probative of credibility, a poor work history may prove probative as well." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir.1998); *see also Webb v. Astrue*, No. 3:11–CV–94(GLS), 2012 WL 589660, at *4 (N.D.N.Y. Feb. 22, 2012) (stating it was proper for ALJ to consider Plaintiff's poor work history); *Outley v. Astrue*, No. 5:09–CV–0141(FJS/VEB), 2010 WL 3703065, at *9 (N.D.N.Y. Aug. 26, 2010) (same). Because the ALJ was permitted to consider Plaintiff's sparse work record in assessing Plaintiff's credibility, the ALJ did not commit a reversible legal error. To the extent Plaintiff argues this evidence should have been weighed differently, that is not a proper consideration for this Court. *See Serra v. Sullivan*, 762 F.Supp. 1030, 1034–35 (W.D.N.Y.1991) ("It is the [ALJ's] function not the district court's to appraise the credibility of witnesses, including the plaintiff.").

### 5. Step Five

The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age, and education. (Tr. 23). At the time the application was filed, Plaintiff was 30 years old, she had a high school education, and had no relevant past work. (*Id.*). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (*Id.*). ALJ Smith found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiffs non-

exertional limitations, but determined that those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (*Id.*). Relying on the Medical–Vocational Guidelines ("Grids"), the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 23–24).

Plaintiff contends the ALJ erred by relying solely on the Grids to find that Plaintiff was not disabled and was instead required to call a vocational expert. (Dkt. 9 at 26). The significance of the Grids is as follows:

> If an ALJ determines that a claimant cannot perform past relevant work, he turns to the Medical–Vocational Guidelines ("Grids") to determine whether the claimant can perform other jobs that exist in the national economy based on the claimant's RFC, age, education and experience. In an "ordinary case," in which the claimant has only an exertional limitation, the ALJ may meet this burden by applying the Grids. When a claimant has both exertional and nonexertional limitations, the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone. If the claimant's nonexertional limitation significantly diminishes his work capacity beyond that caused by his exertional impairment, the ALJ instead must rely on additional vocational resources, such as expert testimony. However, the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance on the grids. "Significantly diminish" means the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Morris*, 2014 WL 1451996, at *9 (citations and quotations omitted). Here, the

ALJ found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiff's nonexertional limitations, but determined that those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. 23). The ALJ's findings were otherwise supported by substantial evidence. Accordingly, the ALJ was not required to contact a vocational expert and did not commit a legal error after determining that Plaintiff's nonexertional impairments did not significantly diminish her ability to engage in meaningful employment.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted, and Plaintiffs motion for judgment on the pleadings (Dkt. 9) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.