Alan J. SCHOLTISEK, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

No. 6:14–CV–6175 EAW.

United States District Court, W.D. New York.

Signed June 22, 2015.

Peter A. Gorton, Lachman & Gorton, Endicott, NY, for Plaintiff.

Amanda Lockshin, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Alan J. Scholtisek ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiffs application for disability benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Elizabeth W. Koennecke was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 8, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiffs motion (Dkt. 8) is denied. Plaintiffs complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On October 12, 2010, Plaintiff protectively filed an application for disability insurance benefits and supplemental security income. (Administrative Transcript (hereinafter "Tr.") 13, 52–54). Plaintiff alleged a disability onset date of September 29, 2008. (Id.). In his disability report, Plaintiff alleged the following disabilities: seizures, asthma, vision problems, foot problems, and pain and numbness in the knees and back. (Tr. 150). The Commissioner denied Plaintiff's application, and Plaintiff requested a hearing by an ALJ on March 30, 2011. (Tr. 13).

On July 16, 2012, Plaintiff, represented by counsel, testified at a hearing via videoconference before ALJ Koennecke. (Tr. 34–51). On September 11, 2012, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 13–27).

On February 27, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Dkt. 1 at 3–6). On April 14, 2014, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. Plaintiff's Testimony

At the time of the administrative hearing, Plaintiff was a 53–year–old male. (Tr. 37). Plaintiff had vocational training in welding and had previously worked as a welder. (Tr. 37–38, 151). He lived alone and took care of his own grocery shopping. (Tr. 49).

Plaintiff testified that his toes were curled and he had pain in his feet rated nine out of ten on a pain scale. (Tr. 41). He had visited a podiatrist, but he did not

have surgery or any other treatment for his feet. (Tr. 42).

Plaintiff also testified that he experienced pain in his low back that could reach a pain level of eight out of ten. (Tr. 43). He stated that he could sit for about 15 minutes before he needed to move around due to pain. (*Id.*). He said that he could only stand in one place for approximately ten minutes before needing to move due to pain, and could walk "half a block" before needing to get off his feet. (Tr. 44). Plaintiff testified that he could lift 15 or 20 pounds before experiencing pain in his back, and noted that he could not "carry it far." (*Id.*).

Plaintiff testified that he had a history of alcohol abuse and had spent time at an inpatient rehabilitation program. (Tr. 46). At the time of the hearing, Plaintiff stated that he drank approximately one six-pack of beer per day. (*Id.*).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

On June 8, 2009, Plaintiff visited Nurse Practitioner ("NP") Karen Gallagher for a physical examination. (Tr. 223–24). NP Gallagher checked Plaintiff's blood pressure and noted that Plaintiff denied pain. (Tr. 223). His examination was normal. (Tr. 224).

On June 9, 2009, Physician's Assistant ("PA") Natalie Ball treated Plaintiff for a rash on both arms and noted that Plaintiff's alcohol consumption was heavy as he drank a six-pack of beer daily. (Tr. 209).

Optometrist Matthew Casey treated Plaintiff on September 25, 2009, for complaints of blurred vision in both eyes. (Tr. 300). Dr. Casey assessed cataracts. (*Id.*).

NP Beth Lyyn De Vries examined Plaintiff on October 16, 2009, and noted that Plaintiff had been "feeling fine," but had not been working. (Tr. 215). Plaintiff reported that he spent "a lot of time 'hanging out' at home and drinks and smokes out of boredom quite a bit. Drinks a 6 pack a day on most days, but drinks more some times[sic]." (*Id.*). NP De Vries prescribed Chantix to attempt tobacco cessation. (Tr. 216).

On January 27, 2010, Plaintiff treated with PA Ball for a rash that Plaintiff claimed had lasted for months. (Tr. 211–12). Plaintiff reported that he felt well and had no pain. (Tr. 212). PA Ball assessed a skin infection not otherwise specified and atopic dermatitis and prescribed Keflex and Elocon. (*Id.*).

Plaintiff returned to Dr. Casey on May 7, 2010, and Dr. Casey diagnosed cataracts, hyperopia, astigmatism, and presbyopia. (Tr. 301). Plaintiff received a glasses prescription on that date. (*Id.*).

On June 27, 2010, Plaintiff treated at Robert Packer Hospital after falling from a porch at a distance of seven to ten feet. (Tr. 258–95). The family reported an up to ten minute loss of consciousness, although Plaintiff denied this. (Tr. 258). Plaintiff reported that he drank approximately four beers that day, that he smoked approximately two packs of cigarettes per day and drank "anywhere from six to 12 beers daily." (*Id.*). A CT scan of the head and chest "did not reveal any acute traumatic process." (Tr. 259). Plaintiff was noted to have "some degree of renal failure" and was directed to follow up with his primary care physician. (*Id.*).

On June 29, 2010, psychiatrist Jay Shah conducted a psychiatric inpatient consult. (Tr. 261). A nurse had reported that Plaintiff was found talking to himself, chewing on his own sock and stated that he was eating the fish. (*Id.*). Plaintiff reported that he was in the hospital after falling shoveling snow. (*Id.*). Dr. Shah diagnosed "delirium secondary to general

medical condition, rule out alcohol withdrawal, delirium tremens, rule out Wernicke–Korsakoff psychosis, and alcohol dependence." (Tr. 262). On July 2, 2010, Dr. Shah noted that Plaintiff was "significantly better." (Tr. 263). Dr. Shah found that Plaintiff continued to have "waxing and waning clouding of sensorium" and recommended that Plaintiff may need "complete remission of his delirium" and removal of guns from his home before returning home. (*Id.*). Dr. Shah recommended that a social worker become involved to refer Plaintiff to AA meetings or alcohol rehab. (*Id.*).

Plaintiff left the hospital against medical advice on July 5, 2010. (Tr. 267). Dr. Shah had recommended that Plaintiff stay in the hospital as "he thought he was not in complete remission from his alcohol withdrawal." (*Id.*). During his hospital stay, Plaintiff was treated for aspiration pneumonia in the right middle lobe, and had acute renal failure that was resolved with IV fluids. (Tr. 268).

On September 21, 2010, Plaintiff had cataract extraction surgery. (Tr. 304). Dr. Rosenberg noted that Plaintiff could return to work the following Monday, but recommended that Plaintiff wear eye protection and avoid heavy lifting for one week. (*Id.*).

Consultative examiner Dr. Sandra Boehlert completed an internal medicine examination of Plaintiff on December 22, 2010. (Tr. 305–09). Plaintiff reported that he smoked occasionally and drank a twelve pack of beer per week. (Tr. 306). Plaintiff cooked, cleaned, did laundry, and shopped "as necessary." (*Id.*). He showered, bathed, and dressed himself daily and watched TV or listened to the radio daily. (*Id.*). Dr. Boehlert noted that Plaintiff had a normal gait but could not walk on his heels or toes without difficulty. (Tr. 307). She diagnosed low back pain, musculoskeletal in nature; poor balance;

history of seizures; chronic foot pain; hypertension, suboptimal control; history of bilateral cataract surgery; and rule out psychological disorder. (Tr. 308). Dr. Boehlert opined that Plaintiff had a mild to moderate limitation to heavy ambulation or exertional activity in the standing position or repetitive bending/twisting of the lumbar spine. (*Id.*). She further noted that Plaintiff should avoid ladders, working at heights, or heavy machinery due to the seizure disorder and ataxia balance problem. (*Id.*). She recommended a psychological evaluation. (*Id.*).

On December 22, 2010, Plaintiff received x-rays of his left knee and lumbosacral spine. (Tr. 311–12). The knee x-ray revealed "no significant bone abnormality." (Tr. 311). The x-ray of the spine revealed an old compression fracture and degenerative changes. (Tr. 312).

On January 19, 2011, Dr. Sara Long completed a consultative psychiatric evaluation of Plaintiff. (Tr. 317–20). Plaintiff reported no history of alcohol or substance abuse, but stated: "I pop a can two times a week, maybe three times a week sometimes." (Tr. 317). Plaintiff reported a DWI in 2008 with a fine, claiming that it was the result of drinking a half can of beer the day after New Year's Eve and refusing to take a sobriety test. (*Id.*). Plaintiff appeared neat and well-groomed with a normal posture and gait. (Tr. 318). Plaintiff was well-oriented and was able to complete serial 3s accurately. (*Id.*). Plaintiff repeated three out of five objects immediately, and after five minutes he could recall two of the objects. (*Id.*). Plaintiff completed four digits forward and digits backward up to two. (*Id.*). Dr. Long stated that Plaintiff appeared to be functioning on an average intellectual level with "a good fund of information." (*Id.*). She noted that "[l]earning disability is not ruled out." (*Id.*).

Dr. Long opined that Plaintiff could follow and understand simple directions and instructions and perform simple tasks independently. (Tr. 319). She found that Plaintiff could maintain attention and concentration as well as a regular schedule. (*Id.*). Dr. Long further opined that Plaintiff was able to learn new tasks although he did poorly on memory tasks. (*Id.*). She noted that Plaintiff appeared to be able to perform some complex tasks and make appropriate decisions within context as well as related adequately with others. (*Id.*). Dr. Long noted that her evaluation was consistent with "stress-related problems and possible history of substance abuse, but none of this appears to be significant enough to interfere with [Plaintiff's] ability to function on a regular basis." (*Id.*). Although Plaintiff performed poorly on memory tasks, Dr. Long noted that it was not clear what this impairment may be attributed to, particularly because Plaintiff reported that his disability was related to his inability to lift things, walk, or climb as well as he could previously. (*Id.*). Dr. Long recommended an IQ evaluation to rule out any significant cognitive problems. (*Id.*).

Plaintiff visited PA Ball on January 20, 2011, for a follow-up examination and to "discuss SSD." (Tr. 448). PA Ball noted that Plaintiff's "[c]ompliance with treatment has been poor; he skips some medication doses due to forgetfulness and expense and does not follow-up as directed." (*Id.*). Plaintiff reported pain in his lumbar spine that radiated to his right posterior thigh. (*Id.*). Plaintiff claimed that the source of his pain was job-related repetitive lifting. (*Id.*). PA Ball noted that Plaintiff appeared "unkempt" but had an otherwise normal examination. (Tr. 449). She recommended Plaintiff use over-the-counter medications and apply moist heat to treat his back pain. (*Id.*).

On February 2, 2011, State agency psychiatrist Dr. Z. Mata reviewed Plaintiffs records concerning alleged mental impairments. (Tr. 343–73). Dr. Mata assessed that Plaintiff experienced depressive disorder, anxiety disorder, and alcohol·abuse disorder. (Tr. 343, 346, 348, 351). Dr. Mata found that Plaintiff's conditions.did not meet a listing. (Tr. 343). Dr. Mata noted that Plaintiff had no history of memory or concentration problems. (Tr. 355). Dr. Mata opined that Plaintiff had a mild to moderate impairment, and concluded that Plaintiff was capable of performing simple entry-type work. (*Id.*).

On February 4, 2011, State agency physician Dr. I. Seok reviewed Plaintiffs records concerning Plaintiff's physical capabilities. (Tr. 324–29). Dr. Seok assessed that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, and did not have any limitation in pushing or pulling. (Tr. 324). Dr. Seok further opined that Plaintiff could stand and/or walk and sit for approximately six hours each in an eight hour workday. (Tr. 325). Dr. Seok found that Plaintiff did not have any limitations in climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, or feeling. (Tr. 326). Plaintiff further had no limitations on his ability to see, hear, or speak, but should avoid exposure to fumes, odors, dusts, gases, and poor ventilation due to asthma and hazards as a result of Plaintiff's history of seizures. (Tr. 326–27).

Plaintiff was admitted at Robert Packer Hospital on September 27, 2011, reporting loss of consciousness after cutting logs. (Tr. 386). Plaintiff's friend who had witnessed the episode reported that Plaintiff was rolling his eyes, frothing at the mouth, and his hands and legs were stiff while Plaintiff was unconscious for approximately five to seven minutes. (*Id.*). Plaintiffs

friend reported that Plaintiff had approximately 12 beers the day before between 2:00 and 3:00 p.m., and that Plaintiff regularly drank approximately 30 cans of beer per day. (*Id.*). Plaintiff reported five episodes of similar attacks in the last five to seven years. (*Id.*). Treatment notes stated that Plaintiff's episodes were more likely alcohol withdrawal as compared to seizures. (Tr. 387, 390). A CT of the head was negative for any acute findings. (Tr. 393).

On September 28, 2011, neurologist Han Suk Koh evaluated Plaintiff in connection with Plaintiff's hospitalization. (Tr. 390). Dr. Koh concluded that Plaintiff had most likely had an alcohol withdrawal seizure and determined that Plaintiff did not need to be placed on antiepileptic medication at that time. (*Id.*). Plaintiff was instructed to contact the Department of Motor Vehicle Office to report his alcohol and seizure status. (Tr. 390).

On October 27, 2011, Plaintiff treated with PA Ball for complaints of lower back pain. (Tr. 450–52). Plaintiff reported some pain relief with over-the-counter medications and changing positions. (Tr. 450). PA Ball noted that Plaintiff had seven seizures in the past 15 years and a history of alcoholism. (*Id.*). She noted that Plaintiff appeared "disheveled," Plaintiff's speech was mildly slurred, and Plaintiff smelled of alcohol. (Tr. 451). She advised Plaintiff that alcohol was likely the source of his seizures. (Tr. 452).

An October 27, 2011 x-ray of Plaintiffs lumbosacral spine revealed "anterolisthesis of L5 on S1 of grade 1 with bilateral facet arthropathy," "superior endplate central depression at L3 of uncertain chronicity," and "mild loss of height vertebra at thoracolumbar junction likely chronic." (Tr. 459).

Plaintiff followed up with PA Ball on July 13, 2012, asking that his feet be examined. (Tr. 453). Plaintiff reported constant aching in both feet. (*Id.*). PA Ball noted that Plaintiff received treatment for a seizure disorder and that "the precipitating event" for Plaintiff's seizure appeared to be overdose from alcohol. (*Id.*). Plaintiff had no reported seizures for the past 24 months and was not on medication for seizures. (*Id.*). Plaintiff was diagnosed with low back pain that Plaintiff reported worsened with activity, walking, back flexion, and twisting movements. (*Id.*). PA Ball also noted that Plaintiff had poor compliance with his treatment for blood pressure. (*Id.*). PA Ball assessed foot pain, onychomycosis, epilepsy, low back pain, essential hypertension, and macrocytic anemia. (Tr. 455). She referred Plaintiff to a podiatrist and advised Plaintiff to stop drinking alcohol. (*Id.*).

On August 2, 2012, Aleksander J. Rupik, M.D. faxed a completed physical limitation form to Scott Learned, Plaintiffs attorney for the underlying benefits application. (Tr. 462). Dr. Rupik indicated that Plaintiff could sit for about four hours and stand or walk for less than two hours in an eight-hour workday and needed a job which permitted him to shift positions at will and take unscheduled breaks. (*Id.*). Plaintiff could never lift 50 pounds, rarely lift 20 pounds, occasionally lift 10 pounds, and frequently lift less than 10 pounds. (*Id.*). Plaintiff could rarely twist or stoop, but did not have significant limitations with reaching, handling, or fingering. (*Id.*). Dr. Rupik opined that Plaintiff would never miss work as a result of his impairments. (*Id.*).

## III. DISCUSSION

### A. Standard of Review

 This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon

the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

█ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46–47 (2d Cir.1996).

█ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

## B. Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

█ The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### C. Analysis of ALJ's Determination

#### 1. Step One

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 29, 2008, the alleged onset date. (Tr. 16).

#### 2. Step Two

At the second step, the ALJ found that Plaintiff had severe impairments of degenerative joint disease of the lumbar spine and alcohol abuse with associated seizures. (*Id.*). The ALJ also noted that Plaintiffs complaints of cataracts, foot pain, and hypertension were non-severe impairments. (Tr. 18). The ALJ concluded that Plaintiff's complaints of knee pain and asthma did not constitute medically determinable impairments. (Tr. 19). Finally, the ALJ found that there were "no medical signs or laboratory findings to substantiate the existence of a medically determinable mental impairment in the claimant due to depression, anxiety, or anything else other than alcohol abuse." (*Id.*).

#### 3. Step Three

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render him disabled. (Tr. 20). Specifically, the ALJ considered Listings 1.04, 11.02, and 11.03. (*Id.*).

#### 4. Step Four

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Tr. 20). The ALJ concluded that, during the course of an eight-hour workday, Plaintiff had the RFC:

[t]o lift and/or carry 50 pounds occasionally; lift and/or carry 25 pounds frequently; stand and/or walk for a total of six hours; and sit for a total of six hours. The undersigned further finds that the claimant should have no exposure to workplace hazards such as dangerous machinery or significant heights. The undersigned additionally finds that the claimant retains the ability, on a sustained basis, to frequently understand, carry out, and remember complex instructions; to frequently respond appropriately to supervision, co-workers, and usual work situations; and to frequently deal with changes in a routine work setting.

(*Id.* at 20–21). ALJ Koennecke then determined that Plaintiff's RFC did not preclude Plaintiff from performing his past

relevant work as a welder. (Tr. 24). As a result, Plaintiff was not disabled within the meaning of the Act.

### a. Substantial Evidence

#### i. Ability to Frequently Understand and Carry Out Complex Instructions on a Sustained Basis

█ Plaintiff argues that the ALJ's finding that Plaintiff was capable of understanding and carrying out complex instructions was not supported by substantial evidence. (Dkt. 8–1 at 6–7). In particular, Plaintiff notes that Dr. Long, whose opinion the ALJ assigned "great weight," found that Plaintiff "did poorly" on his memory tasks and digits backwards tests. (Tr. 19, 319). Plaintiff objects to the ALJ's conclusion that he is able to frequently respond appropriately to supervision, co-workers, and usual work situations as well as changes in the work setting. (Dkt. 8–1 at 7). Plaintiff notes that he had been observed by medical staff to be "talking to himself, chewing on his own sock and, when confronted, replied that he was eating the fish." (*Id.* (citing Tr. 261)). Plaintiff argues that he had been diagnosed with delirium. (*Id.* (citing Tr. 263)). Further, Plaintiff notes that examination revealed the possibility that he had a learning disability. (*Id.* at 8 (citing Tr. 318)).

The Commissioner notes that "Plaintiff had consistently unremarkable psychological examination findings throughout the relevant period." (Dkt. 11–1 at 23). In addition, the Commissioner argues that Dr. Long opined that Plaintiff could follow and understand simple directions and instructions, perform some complex tasks, relate adequately with others, and make appropriate decisions within context despite the fact the Plaintiff did poorly on his memory tasks, supporting the ALJ's findings. (*Id.*).

Plaintiff primarily relies on the incident when he was hospitalized and found chewing on a sock as an example of potential mental impairment. However, at that time, Plaintiff was on medications and was diagnosed "delirium secondary to general medical condition, rule out alcohol withdrawal, delirium tremens, rule out Wernicke–Korsakoff psychosis, and alcohol dependence." (Tr. 262). Dr. Shah found that Plaintiff continued to have "waxing and waning clouding of sensorium" and recommended that Plaintiff may need "complete remission of his delirium" before returning home. (*Id.*). Dr. Shah recommended that a social worker become involved to refer Plaintiff to AA meetings or alcohol rehab. (*Id.*). As a result, Plaintiffs delirium was not due to a cognitive impairment, but rather was likely due to Plaintiff's alcohol withdrawal and delirium tremens, a fact noted by ALJ Koennecke in her analysis. (Tr. 19).

Plaintiff argues that the ALJ had a duty to develop the record with respect to Plaintiff's possible learning disability by way of an intellectual evaluation in light of Dr. Long's opinion that Plaintiff had a possible learning disability or "significant cognitive problems." (Tr. 8–1 at 8 (citing Tr. 319)).

█ "It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case, and that remand is appropriate where this duty is not discharged." *Brown v. Comm'r of Soc. Sec.,* 709 F.Supp.2d 248, 255 (S.D.N.Y.2010) (citations omitted). "The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel." *Cruz v. Astrue,* 941 F.Supp.2d 483, 495 (S.D.N.Y.2013). Encompassed in this duty is the requirement that an ALJ assemble the claimant's complete medical history and re-contact treating physicians or ob-

tain consultative examinations where the information received is inadequate to determine whether the claimant is disabled. *See Wells v. Colvin,* No. 14–CV–197–JTC, 2015 WL 1280536, at *7 (W.D.N.Y. Mar. 20, 2015) (citing 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii)).

■■■ Having concluded, based on a review of the complete medical record, that there were "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment in the claimant due to depression, anxiety, or anything else other than alcohol abuse," the ALJ was not required to seek out further information with respect to any alleged mental impairments. (Tr. 19). ALJ Koennecke noted that only a consultative examiner and a reviewing psychiatrist had opined that Plaintiff may have depression, anxiety, or cognitive difficulties, and these individuals were not informed of Plaintiff's history of alcohol abuse. (*Id.*). In fact, Dr. Long opined that her evaluation of Plaintiff was consistent with stress-related problems and a possible history of substance abuse, but concluded that this would not interfere with Plaintiff's ability to function on a regular basis. (*Id.*). Based on these findings, ALJ Koennecke was not required to further develop the record, and her RFC finding that Plaintiff was capable of understanding and carrying out complex instructions was supported by substantial evidence.

### ii. Ability to Perform Medium Work

■■■ Plaintiff contends that there is "no credible medical evidence" to support the ALJ's finding that Plaintiff was capable of performing medium work. (Dkt. 8–1 at 9). Plaintiff notes that he can only walk approximately one block before experiencing "severe pain" in his back, and can only occasionally lift 15–20 pounds for "brief periods." (*Id.*). Plaintiff claims that this

is supported by the objective medical record as well, insofar as CT imaging of Plaintiff's spine has shown structural injury. (*Id.* at 9–10). Particularly, Plaintiff objects to the ALJ determining that Plaintiff could perform medium work when Dr. Boehlert opined that Plaintiff had up to moderate limitation on heavy ambulation or exertional activity in the standing position or repetitive bending/twisting of the lumbar spine, among other limitations. (*Id.* at 10–11).

The Commissioner counters that "the ALJ's RPC determination was amply supported by the medical opinions of consultative examiner Dr. Boehlert and State agency physician Dr. Seok, as well as the largely unremarkable assessments reflected throughout Plaintiff's treatment records." (Dkt. 11–1 at 18).

"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

■■■ "The Social Security regulations have long recognized that subjective symptomology is not, standing alone, sufficient to establish the existence of a disability." *Greene v. Colvin,* 936 F.Supp.2d 216, 227 (W.D.N.Y.2013) (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)). "A plaintiff must also provide medical findings that show the existence of a medical condition that could reasonably be expected to produce the alleged symptoms and that, when considered with all other evidence, demonstrates that she is disabled." *Id.*

Here, ALJ Koennecke noted that imaging studies of Plaintiffs lumbar spine did not show nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. (Tr. 20). The x-ray did show an old compression fracture and some degenerative

changes. (Tr. 312). Further, although Plaintiff reported pain in his lower back to PA Ball, his objective examinations were normal. (Tr. 449, 453). In addition, Dr. Boehlert noted that Plaintiff reported low back pain, but found that nonetheless Plaintiff had only a mild to moderate limitation in repetitive bending or twisting of the lumbar spine. (Tr. 307). The Regulations do not state whether such a limitation would preclude an individual from performing work at a medium exertional level. Accordingly, there was substantial evidence to support ALJ Koennecke's finding that Plaintiff was capable of performing work at a medium level of exertion.

### iii. Treating Physician Rule

█ Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) ... [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). As explained by the Second Circuit Court of Appeals:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv)

whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule ... and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

### Dr. Rupik

█ ALJ Koennecke assigned treating physician Dr. Rupik "little weight," finding that Dr. Rupik's opinion was not supported by the medical record. (Tr. 22). Plaintiff argues that this was an improper assessment of Dr. Rupik's opinion under the treating physician rule and contends that Dr. Rupik's opinion should have been assigned "controlling, or at least significant, weight." (Dkt. 8–1 at 12–14). The Commissioner counters that ALJ Koennecke properly considered the treating relationship between Plaintiff and Dr. Rupik, but was not required to assign Dr. Rupik's opinion controlling or significant weight because the opinion was not consistent with the other opinions and information in the medical record. (Dkt. 11–1 at 22).

In assessing Dr. Rupik's opinion, the ALJ expressly noted that "the opinion of Dr. Rupik would normally be given controlling weight, as long as his assessment was supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the other substantial evidence in the claimant's case record." (Tr. 22). However, ALJ Koennecke reviewed the medical record and found that Dr. Rupik's conclusion that Plaintiff was incapable of working at even a sedentary level of exertion was inconsis-

tent with the medical record, including Dr. Rupik's own treatment notes. (*Id.*). "It is not enough for the ALJ to simply say that [a treating physician's] findings are inconsistent with the rest of the record. The ALJ [must] provide[ ] reasons which explain that inconsistency with these other parts." *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 291 (E.D.N.Y.2004) (alterations in original). Here, ALJ Konneke did provide examples of inconsistencies between Dr. Rupik's findings and the medical record. The ALJ noted that Plaintiff first sought medical treatment for his back pain on January 20, 2011, at the same time he wanted to discuss his application for social security benefits. (*Id.*). Plaintiff's musculoskeletal examinations showed a normal gait despite the disfigurement of Plaintiff's toes. (Tr. 307).

In addition, as the ALJ noted, Dr. Rupik had not personally examined Plaintiff, and his medical source statement was essentially a "check a box" form containing minimal comments or attachments. (Tr. 23). "Form reports of this sort are, by their nature, of limited evidentiary value." *Piatt v. Colvin*, 80 F.Supp.3d 480, 495, No. 13–CV–6436 EAW, 2015 WL 274180, at *15 (W.D.N.Y. Jan. 22, 2015). Accordingly, the Court finds no reason to upset the ALJ's determination affording Dr. Rupik's opinion "little weight."

### Dr. Boehlert

Plaintiff also argues that the ALJ failed to conduct a "meaningful analysis" of the report of consultative examining physician Boehlert. (Dkt. 8–1 at 14). Plaintiff contends that the ALJ failed to properly explain the applicable regulatory factors when assigning significant weight to Dr. Boehlert's opinion. (*Id.*).

ALJ Koennecke placed "significant weight" on Dr. Boehlert's opinion based on the fact that that Dr. Boehlert had conducted a physical examination of Plaintiff taking into account Plaintiff's complaints of pain. (Tr. 21). The ALJ also noted that the opinion was consistent with the medical evidence of record. (*Id.*).

"[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'" *Smith v. Colvin*, 17 F.Supp.3d 260, 268 (W.D.N.Y.2014) (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F.Supp.2d 67, 79 (N.D.N.Y.2005)). "This is particularly so where the consultant directly examines the applicant." *Id.* As a result, although ALJ Koennecke did not expressly walk through the factors of the treating physician rule, she did provide "good reasons" for the weight she assigned to Dr. Boehlert.

### Dr. Seok

Plaintiff additionally argues that the ALJ gave "no proper explanation" for assigning only "some weight" to the opinion of Dr. Seok and then assigning Plaintiff an RFC for medium work in accordance with Dr. Seok's opinion. (Dkt. 8–1 at 15).

In considering Dr. Seok's opinion, ALJ Koennecke explained that there was support in the medical record for Dr. Seok's opinion that Plaintiff could "lift/carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and should avoid concentrated exposure to hazards such as machinery and heights." (Tr. 22). The ALJ also noted that this portion of Dr. Seok's opinion was consistent with Dr. Boehlert's opinion. (*Id.*). ALJ Koennecke then explained that she found no support for the portion of Dr. Seok's opinion that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation because Plaintiff had not had a diagnosis or treatment for a respiratory condition for the

past twenty years. (*Id.*). Accordingly, contrary to Plaintiff's argument, the ALJ clearly explained her reasons for assigning only some weight to Dr. Seok's opinion, in light of the fact that she was discrediting the portion of Dr. Seok's opinion that was not supported by the medical record.

### b. Credibility Determination

■ The ALJ found that Plaintiff's allegations of disability were not supported by the evidence of record. (Tr. 23). For example, ALJ Koennecke noted that although Plaintiff had testified that his back pain prevented him from working, Plaintiff was chopping wood before becoming hospitalized in September 2011 after a seizure that was suspected to be related to Plaintiffs excessive drinking. (Tr. 23–24). The ability to chop wood contradicted Plaintiff's testimony that he could not perform such manual labor. In addition, the ALJ noted that Plaintiff's seizures had only occurred in connection with his intoxication. (Tr. 24).

### c. Capable of Performing Past Relevant Work

■ ALJ Koennecke determined that Plaintiff's RFC did not preclude Plaintiff from performing his past relevant work as a welder. (Tr. 24). She concluded that work as a welder did not "require the performance of work-related activities precluded by the claimant's residual functional capacity." (*Id.*). Specifically, the ALJ noted that Plaintiff could perform work as a plastics heat welder or gas welder as Plaintiff was capable of performing work at a medium level of exertion with no exposure to heights. (Tr. 25). The ALJ further found that, in the alternative, Plaintiff could perform work at the light level of exertion. (Tr. 27)

Plaintiff argues that the ALJ erred in finding that he could perform medium work, and therefore erred in concluding that he could perform his previous work as

a welder. (Dkt. 8–1 at 15). As previously noted, the ALJ's determination that Plaintiff was capable of performing at least medium work is supported by the record. The ALJ considered Plaintiff's past work as a welder and found that Plaintiff's testimony concerning his duties as a welder as well as the description of welder in the Dictionary of Occupational Titles demonstrated that Plaintiff's RFC did not preclude him from performing his past relevant work. (Tr. 25).

### 5. Step Five

■ Despite finding that Plaintiff was not disabled at step four of her analysis, ALJ Koennecke continued to analyze Plaintiff's claim under step five. (Tr. 25). Plaintiff contends that in analyzing the Grids, the ALJ was required to consider the fact that as of October 5, 2009, Plaintiff was age 50 and therefore qualified as an individual "approaching advanced age" who, if unable to perform light work, would automatically be found disabled. (*Id.* at 15–16). In addition, Plaintiff argues that the ALJ should have consulted a vocational expert in light of the fact that Plaintiff experienced nonexertional limitations. (*Id.* at 16).

■ At step five of the analysis, the burden shifts to the Commissioner to demonstrate that there are a substantial number of jobs available in the national economy for Plaintiff to perform. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir.1998). The Commissioner will utilize the Medical Vocational Guidelines or "Grids" found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir.1996). However, "if a claimant has nonexertional impairments which 'significantly limit the range of work permitted by his exertional limitations,' then the Commissioner cannot rely upon the grids, and instead 'must introduce the testimony of a vocational expert (or other similar

evidence) that jobs exist in the economy which claimant can obtain or perform.'" *Griffith v. Astrue,* No. 08–cv–6004 CJS, 2009 WL 909630, at *4 (W.D.N.Y. Mar. 31, 2009) (citing *Pratts,* 94 F.3d at 39).

In finding that Plaintiff was capable of performing medium work, the ALJ found that Plaintiff was also capable of performing light work, and as a result, the fact that Plaintiff was approaching "advanced age" was of no consequence to the ALJ's ultimate determination. (Tr. 27).

Although Plaintiff experienced nonexertional limitations, the ALJ was not required to consult a vocational expert because she found that Plaintiff's nonexertional limitations did not result in erosion to Plaintiff's occupational base. *Morris v. Comm'r of Soc. Sec.,* No. 5:12–cv–1795(MAD/CFH), 2014 WL 1451996, at *9 (N.D.N.Y. Apr. 14, 2014) ("the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance on the grids."); *Weed Covey v. Colvin,* 96 F.Supp.3d 14, 35, No. 13–CV–6602 EAW, 2015 WL 1541864, at *19 (W.D.N.Y. Apr. 6, 2015) ("the ALJ was not required to contact a vocational expert and did not commit a legal error after determining that Plaintiff's nonexertional impairments did not significantly diminish her ability to engage in meaningful employment."). In sum, the ALJ did not commit a legal error at step five of her analysis of Plaintiff's claim.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiffs motion for judgment on the pleadings (Dkt. 8) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.